**U.S. REGIONAL SUPPLIER AND PURCHASE AGREEMENT**

**between**

**Circle KStores Inc. – Florida Division**

**("Customer")**

**and**

**Lakshmi Distributors, LLC, dba C-StoreMaster**

**("Supplier")**

**Effective Date:**

**December 1, 2021**

**U.S. REGIONAL SUPPLIER AND PURCHASE AGREEMENT**

| | |
|---|---|
| **BETWEEN:** | **Circle K Stores Inc., - Florida Division.,** with one of its principal locations at 3802 Corporex Park Dr., Ste 200, Tampa, FL 33619, |
| | (hereinafter referred to as "Customer") |
| **AND:** | **Lakshmi Distributors, LLC, dba C-StoreMaster** with one of its principal locations at {Address} |
| | (hereinafter referred to as "Supplier") |
| | (Customer and Supplier are sometimes hereinafter referred to collectively as the "Parties" and individually as a "Party") |

**WHEREAS** Customer's United States network is comprised of stores primarily operating under the banners "Mac's" and "Circle K" (the "Stores") located in geographical markets throughout the United States (the "Client Divisions") and Customer reserves the right to extend any and all and or any part of the benefits of this Agreement to any of its Affiliates, as defined herein.

**WHEREAS** as of the Effective Date, the Parties desire to enter into this Agreement.

**NOW THEREFORE,** the Parties agree as follows:

1. **SUPPLY**

    1.1     **Products**

Supplier shall sell and supply Customer with the products listed on Schedule A (the "Products").

In the event that Supplier provides Products that are consumables, (Schedule C entitled "Consumable Products - Supplier Responsibilities and Commitments") shall also apply to this Agreement.

As of the Effective Date, Supplier will make an inventory count of the Products on hand at each Customer location. Upon the agreement of Supplier and Customer of the Products on hand at a location, Supplier will credit the account of Customer with Nexxus with the value such inventory for purposes of converting the distribution of all Products hereunder to scan based.

    1.2     **Inventory**

Supplier shall maintain an inventory of Products at all times which will meet Customer's need for Products based on Customer's historical purchases and such other forecasts as Customer may

from time to time provide to Supplier. Customer shall display the inventory in stores prominently that is clearly visible to consumers. The Parties acknowledge and agree that any of Supplier's inventory located in the Customer's stores and locations is and remains the property of Supplier until sold by Customer to the consumer.

### 1.3   Additional and Deleted Items

If Supplier introduces items for sale in the United States in addition to those listed on Schedule A, Supplier may offer such additional items for sale to Customer under this Agreement. Customer may, at its sole discretion, elect to add or delete such other items to the list of Products under Schedule A upon a thirty (30) calendar day prior written notice to Supplier. All additional products must be authorized through each Division's marketing and price book departments.

### 1.4   Customer Locations

RESERVED

### 1.5   Affiliates & Franchisees

For the purposes of this Agreement, "Affiliated Companies" shall include Circle K Stores Inc., Mac's Convenience Stores, LLC, RDK Ventures LLC, CST Diamond L.P., Bacon Grocery Company LLC, Holiday Stationstores, LLC, Erickson Petroleum, LLC, Independent Diversified Transportation, LLC, Holiday Diversified Services, LLC and TMC Franchise Corporation, as well as any of their affiliated and related entities, parents and subsidiaries that currently exist or may exist in the future.

### 1.6   Supplier Portal

Notwithstanding anything in this Agreement to the contrary, Customer shall place all orders of Product, confirm delivery of Product, and input inventory counts through Supplier's web-based portal.

## 2.   STANDARDS OF QUALITY

### 2.1   High Standards

Supplier shall provide Products that meet or exceed industry standards and quality, which are free from any latent or patent defects in material or workmanship. Furthermore, Supplier represents and warrants that all Products provided, processed, manufactured, sold, shipped or delivered under this Agreement will be, as of the date of shipment or delivery: (i) Not adulterated or misbranded within the meaning of Applicable Law; (ii) Free from defects and of merchantable quality and fit for its intended purpose (iii) purposes for which goods of the same nature and description would ordinarily be used; (iv) In compliance with Applicable Law, including all safety, health, product identification, labelling and packaging standards and specifications; and (v) Packaged in accordance with the specifications set forth in this Agreement or, if such specifications are not set forth herein, in such a way as is necessary in order to reasonably protect and preserve the Products, all in accordance with local law where such Products are delivered to Customer.

### 2.2   Returns / Defects

Neither Customer's audit and/or inspection rights under this Agreement, nor the fact that Supplier has sent goods or samples for Customer's inspection, shall limit the Supplier's responsibility for ensuring that the Products are in compliance with the contractual and Applicable Law.

Upon notice from Customer, Supplier shall take back and remove, at its own cost and expense, all Products which do not meet the specifications set forth in Schedules attached hereto (if any), and/or the standards and representations and warranties under this Agreement and shall reimburse (or credit) Customer for the full cost of such Products. Upon taking back or removing defective Products, Supplier shall provide replacement Products to Customer within a mutually agreed timeframe.

Where applicable, Customer is entitled to remedy the defective Products itself or employ a third party to do so at Supplier's expense and cost or to reduce the contract price accordingly as mutually agreed with the Supplier. The same shall apply if awaiting Supplier's remedy will cause any financial damages to Customer. In such event, Customer shall provide Supplier with a thirty (30) calendar day prior notice before initiating the rectification work.

In the event of any recall, market withdrawal, stock recovery, or similar action (each, a "retrieval"), regarding any Product previously purchased and distributed hereunder, Supplier shall promptly notify Customer of any such retrieval. Further, if Supplier is notified by any government agency or by one of its suppliers of the possibility of a retrieval, Supplier shall promptly notify Customer of the same. Supplier shall reimburse Customer for all reasonable costs and expenses involved in any retrieval, including, without limitation, (i) handling and preparing the Product for reshipment to Supplier or its designee, (ii) destroying the Product, if necessary, and (iii) replenishing inventory as a result of the Product's removal, return or necessary destruction. Customer shall ship to Supplier or its designee the Products subject to a retrieval within thirty (30) calendar days of Supplier's notice to Customer of the retrieval event.

## 3. ORDERS AND DELIVERY

### 3.1 Customer Requirements

All orders and delivery shall meet the respective Division's requirements, as agreed to by Supplier and each Division.

The Products shall be packed in accordance with the specifications set out in the Agreement or if such specifications are not agreed, in such a way as is necessary in order to reasonably protect and preserve the Products, the whole in accordance with local law where such Products shall be delivered to Customer.

Furthermore, the Products shall in all respects comply with the Agreement and shall in addition be of a high quality and fit for its intended purpose and purposes for which goods of the same description would ordinarily be used.

### 3.2 Delivery, Passing of Risk and Title to Products

Supplier controls the distribution to the Stores or Franchisees. Should Supplier have cause to believe that it will be unable to meet the agreed upon delivery schedule or any milestones set forth in this Agreement, it shall promptly notify the Customer in writing stating the reason for the delay, the effect on the agreed upon delivery schedule and include a proposal on how the delay can be minimized. Unless otherwise agreed, delivery shall be deemed to have taken place when the Products have been handed over to Customer or Franchisee according to the agreed upon delivery terms, conditions and location. Title of the Products shall pass to Customer or Franchisee at the time of delivery.  Therefore, Supplier shall bear the full risk of the Products until such Products have been satisfactorily delivered to Customer or Franchisee.

### 3.3 Force Majeure

Neither Customer nor Supplier shall be liable for delay or failure to perform, in whole or in part, any of the agreements or obligations set forth in this Agreement due to contingencies beyond its control, including, but not limited to, lack of raw materials, labor disturbances (including strikes and lockouts), war or national emergency, epidemics, quarantines, acts of God, hurricanes, fire, storms, accidents, government regulation or interference, riots, terrorism or any other cause beyond its control (collectively, "Force Majeure"). A Party claiming that its performance is delayed by Force Majeure shall give the other Party immediate notice of the occurrence causing the delay. The inability to obtain financing or lack of money shall not constitute Force Majeure, and this provision shall not excuse non-payment of monies hereunder.

## 4. PRICING AND REBATES

All prices and costs for the Products are as stated on the attached Schedule A.

### 4.1 Price Increase

The prices reflected on Schedule A are effective as of the Effective Date. The prices are subject to change on 30 – day notice in the event the cost to Supplier of the Products increases. Supplier agrees that the increase in the prices set forth on Schedule A shall not exceed the increase in its cost of the Products. Supplier shall also provide prompt written notice to Customer of the discontinuance of any Products, or any material changes in specifications affecting the form, fit, or function of any Product.

### 4.2 Competitive Offerings

Supplier agrees it shall provide competitive prices for its Products and to offer the comparable net prices for its Products that it offers to any other customer of Supplier in the same channel of trade, as well as dollar and drug channel, purchasing the Products under similar circumstances including without limitation, similarity in purchase volumes and terms and conditions to ensure the prices remain competitive.

### 4.3 Rebates

If applicable, Supplier shall pay Customer the "Rebate Pricing" described on Schedule B attached hereto and by reference made a part herein (the "Rebates").

### 4.4 Rebate Payment and Set Offs

Supplier shall pay all rebates within fifteen (15) calendar days of receipt of a Divisions' invoice to that effect. Rebates paid later than fifteen (15) calendar days will be subject to a late fee that is the lesser of one and one-half percent (1½%) or the maximum interest rate allowed by state law.

If the Supplier controls the distribution to the Stores, then Supplier agrees that Customer has the right to set off from the invoice any amount owed to Customer by Supplier. Conversely, Customer agrees that Supplier has the right to offset any amount owed to Supplier. Nothing herein shall give either Party a right to offset any amount owed to or due from a Franchisee.

Upon expiration or termination of this Agreement for any reason, within fifteen (15) calendar days of the date of termination of this Agreement, Supplier shall pay all Rebates earned through the date of termination.

### 4.5 Shrinkage

Supplier's shrinkage allowance is 1.0% (the "Allowance").  Shrikage shall be calculated quarterly; provided, Supplier may require the calculation of shrinkage monthly for those stores of Customer with a high shrinkage rate.  Customer shall be responsible for any shrinkage of Products in excess of the Allowance.  Customer or its agents shall conduct inventory counts at least monthly and shall input the counts in Supplier's portal by the tenth day of the following month.  Payments for shrinkage shall be due and payable by the end of the month in which the shrinkage calculation is provided to Customer.

### 4.6 State taxes.

The Price shall be increased dollar for dollar automatically without prior notice to Customer by any increase in the state taxes imposed on Supplier in connection with the distribution of the Products.

## 5. INVOICING AND PAYMENTS

Supplier will offer 100% full Scan Based Trading ('SBT Business") on all products supplied. Nexxus will manage the SBT scan data with Circle K. Supplier will pay any fee charged by Nexxus for EDI services.  All payments shall be timely made.

## 6. TERM & TERMINATION

The term of this Agreement shall be from **December 1, 2021** until **December 1, 2022** (the "Term"), subject however to the following conditions.

Upon expiration of the Term, this Agreement will continue on a a rolling three month basis until terminated in accordance with this Agreement.

Either party may terminate this Agreement by written notice to the other party delivered at least 90 days prior to the end of the then current term of its intent that the term not renew at the expiration of such term.

Upon expiration or termination of this Agreement for any reason:

**(a)**  each Party shall promptly pay the other all undisputed amounts due with respect to Products sold and delivered prior to termination; and

**(b)**  if Products bear any Intellectual Property of Customer, Customer shall purchase and take delivery of all such branded Products stocked by Supplier exclusively for resale to Customer within ninety (90) calendar days; provided; however, that Customer shall not be required to make payment for any such Products which exceed stocking specifications set forth on Schedule A.  If no such specifications are expressed on Schedule A, then Customer shall not be required to make payment for any such products which exceed the weekly average standard stock amounts for the preceding six (6) month period.

In addition, upon termination or expiration of this Agreement, each Party will use commercially reasonable efforts to assist the other Party in carrying out and effectuating the termination of this Agreement as may be necessary for the orderly, non-disrupted business continuation of each Party.

## 7. DEFAULT, INSOLVENCY AND BREACH

For purposes of this Agreement, a Party is in "Default" if such Party:

**(a)** fails to perform any material obligation under this Agreement; or

**(b)** fails to provide reasonable assurances of solvency upon written request by the other Party, suspends or discontinues business operations, makes an assignment for the benefit of creditors, commences voluntary or has commenced against it involuntary bankruptcy proceedings, or voluntarily appoints or involuntarily has appointed a receiver or trustee of all or any part of their property, or has an involuntary lien filed or levied against, or foreclosure or seizure of a material portion of its assets, including inventory, by a creditor, lienholder, lessor, governmental authority or other person; or

**(c)** violates the Confidentiality provisions of this Agreement which results in a loss to the other Party;

**(d)** violates any Applicable Laws; or

**(e)** commits any act or omission which is unsafe, illegal, criminal or fraudulent.

In the event a Default specified in (a) above has occurred, the non-defaulting Party shall send the defaulting Party a written notice identifying the Default and requesting that such Default be cured within thirty (30) calendar days.

If the defaulting Party remains in Default after the thirty (30) calendar day cure period, the non-defaulting Party is entitled to all rights and remedies available under this Agreement or at law or in equity, including, without limitation, the right to terminate this Agreement by written notice to the defaulting Party. For purposes of this Agreement, "cure" means complete corrective action and the payment of all undisputed fees, expenses and costs incurred by the non-defaulting Party as a result of the other Party's default.

In the event a Default specified in (b) – (e) above has occurred, the non-defaulting Party may immediately terminate this Agreement upon written notice to the defaulting Party.  Further, the non-defaulting Party shall be entitled to all rights and remedies available under this Agreement or at law or in equity.

Upon delivery of a written notice of termination this Agreement will immediately terminate and relieve all further obligations, except for those which by their nature are intended to survive the expiration or termination of this Agreement, including the obligation by Supplier to pay rebate amounts owed.

**8.   ENVIRONMENTAL, ETHICS AND SECURITY**

Supplier undertakes to provide Products, which pose no threat or danger to the environment and which have been manufactured or assembled in conditions respectful of human rights, including but not limited to, slavery and human trafficking.

Supplier shall use all due care and diligence to maintain the security of its business (Including but not limited to its computer/data systems) consistent with industry standards and Applicable Laws. In the event there is a perceived, threatened or actual breach in Supplier's computer/data systems, Supplier must comply with all Applicable Laws and must give Customer immediate notice of such incident irrespective of whether Customer's data has been compromised. Following such incident, Supplier will reasonably cooperate with Customer to ensure the security of Customer's data within Supplier's systems and in Customer's investigations regarding the incident, and Supplier will share with Customer the results of any investigation undertaken for the benefit of Supplier.

## 9. REPRESENTATIONS AND OTHER AGREEMENTS

### 9.1 Validity of Both Parties

Each Party represents and warrants it is duly organized, validly existing and in good standing under the laws of the place of its origin and possesses all the necessary authority to enter into and perform its obligations under this Agreement.

### 9.2 Confidentiality and Proprietary Data

The Parties agree that any information obtained by either of them under this Agreement or in the course of performance under this Agreement shall be treated as confidential/proprietary and shall not be used or disclosed to any other person or entity except as may be required by law or with the other Party's prior written consent. If either Party is required to disclose any confidential/proprietary information in connection with any legal or administrative proceeding or investigation such Party will immediately notify the other Party of such request so that it may seek a protective order or other remedy or waive compliance hereunder.  Unless or until any such confidential information becomes public by no action or omission of Supplier, the provisions of this Section shall survive expiration or termination of this Agreement.

### 9.3 Press Release and Marketing

Without limiting any confidentiality obligations of either Party set forth in this Agreement, Supplier shall not issue press releases, or otherwise advertise or market any information relating to any terms of this Agreement, the existence of this Agreement, or the existence of a relationship between the Parties, including mentioning or implying the name of Customer, or any of its affiliates, subsidiaries or personnel, without the prior written consent of Customer which consent may be given or withheld at Customer's sole discretion.  The provisions of this Section shall survive expiration or termination of this Agreement.

### 9.4 Intellectual Property

Except for Products bearing the trademarks, logos, trade dress or copyrighted material (the "Intellectual Property") of Customer, Supplier represents and warrants that it possesses all of the Intellectual Property rights pertaining to the Products (including, without limitation, the packaging, the container and the labelling). Supplier shall indemnify Customer against all claims, losses, liabilities, damages, costs and expenses (including reasonable attorneys' fees) concerning claims alleging that the Products or any part thereof or anything done by Supplier hereunder infringes any Intellectual Property right or knowhow of any third party. Such indemnification by Supplier shall not apply if Supplier is using Customer's Intellectual Property.  The provisions of this Section shall survive expiration or termination of this Agreement.

If any Intellectual Property is developed by Customer in connection with the Products, all such Intellectual Property, as well as Intellectual Property relating to any development process, which has been provided to Supplier by Customer shall rest with Customer.  Products developed in cooperation between the Parties or by Supplier on behalf of Customer under the Agreement, constitute part of the Products and shall be Customer's sole property, including the right to amend and/or further develop, unless otherwise expressly agreed in writing.  All material handed over to Supplier by Customer is Customer's property and will be returned when delivery of Products has been completed unless otherwise agreed in writing between the Parties. This Agreement does not give Supplier any rights to use Customer's Intellectual Property in any way other than as specified in this Agreement.

### 9.5 Compliance with Laws

Supplier and Customer shall comply with any and all federal, state, local laws, regulations and ordinances as they may apply to the Products as well as to the terms and conditions of this Agreement ("Applicable Law").

## 10. NOTICES

Any notice, consent, waiver or other communication required or permitted under this Agreement will be effective only if it is in writing and (i) personally delivered, or (ii) sent by a nationally or internationally recognized overnight delivery service (such as FedEx, UPS or DHL) to Supplier or Customer, as the case may be, addressed as set forth below (or to such other address as Supplier and Customer may hereafter designate by written notice provided in the manner aforesaid).  All such notices, consents, waivers or other communications will be deemed to have been given and received on the date of delivery.

| SUPPLIER: | CUSTOMER: |
|---|---|
| **Lakshmi Distributors, LLC, dba C-StoreMaster**<br>3100 University Drive NW<br>Huntsville, AL 35816 | **Circle K Procurement and Brands Ltd.**<br>Circle K House, Beech Hill,<br>Clonskeagh, Dublin 4, D04 Y016 Ireland<br>Attn: Director of Global Procurement |

## 11. GENERAL

### 11.1 Indemnification

Supplier agrees that it shall indemnify, defend (with counsel to be approved by Customer, such approval not to be unreasonably withheld), and protect Customer and its respective officers, directors, employees, parents, affiliates, Stores, franchisees and agents (the "Customer Indemnitees"), and hold the Customer Indemnitees harmless from any and all claims, penalties, demands, suits, causes of action, loss, cost, damages, expense, liabilities, and judgements (including, without limitation, court costs and reasonable attorneys' fees actually incurred at customary hourly rates) ("Claims") incurred in connection with or arising at any time from (i) any matter concerning the Customer Indemnitees to the extent associated with the Products, or performance of providing services and/or Products to Customer Indemnitiees, (ii) the presence or activity of Supplier's employees, agents, contractors or representatives while on Customer Indemnitees' premises; (iii) violations by the Supplier of any applicable laws, rules and regulations concerning the manufacture, distribution, sale, price, quality, safety and delivery of the Products provided for herein and any Order, or any applicable laws, rules and regulations concerning the supply and delivery of the products or services provided for herein, including any state or local taxing authorities, (iv) violation of third party rights, including intellectual property rights, (v) any Default by Supplier in the observance or performance of any of the terms, covenants, or conditions of this Agreement, (vi) any use of Supplier's Products and any information or materials provided by the Supplier with respect thereto, (vii) a Claim that is attributable in whole or in part to a failure of Products to work as intended or to the negligence or recklessness of Supplier, including any breach of any representations or warranties made by Supplier under this Agreement, and (viii) any claims (including those made by employees and customers of Customer Indemnitees) for personal or bodily injury, illness, death or property damage (including that of Customer Indemnitees) to the extent arising out of or resulting in any way from the delivery, sale, consumption or use of the Products or, any alleged defect in the Products.

Supplier's duty to indemnify Customer Indemnitees shall survive termination or expiration of this Agreement with respect to any claims or liability occurring prior to such expiration or termination.

Notwithstanding anything in this Section to the contrary, Supplier shall not be obligated to indemnify Customer Indemnitees to the extent any such Claims are caused by the negligence, gross negligence, or intentional acts of Customer Indemnitees.

### 11.2    Insurance

So long as this Agreement is in effect, Supplier will, at its sole cost and expense, procure and keep in force at all times while this Agreement is in effect insurance for the following minimum types and limits: (a) Commercial Liability Insurance written on an "occurrence" basis with at least Five Million and no/ 100 Dollars ($5,000,000.00) per occurrence, and Eight Million and no/100 Dollars ($8,000,000.00) aggregate for bodily injury and property damage, and providing coverage not less than that of a standard commercial general liability policy including hazards of operations coverage, products/completed operations coverage.  Requirements may be fulfilled through a combination of a commercial liability and an umbrella liability policy; (b) Comprehensive Automobile Liability Insurance, covering all hired, owned or otherwise operated non-owned vehicles with a minimum single limit of One Million and no/100 Dollars ($1,000,000.00) for bodily injury and property damages per occurrence; (c) Workers' Compensation Insurance as required by law; and (d) Employers Liability Insurance with a minimum limit of One Million and no/100 Dollars ($1,000,000.00) or an amount that satisfies statutory requirements (whichever is greater). Within ten (10) days after the Effective Date of this Agreement, and upon each policy renewal and from time to time thereafter, upon written request by Customer, Supplier shall cause the insurer issuing such policies, to issue a certificate to Customer confirming that such policies have been issued and are in full force and effect and provide coverage for Customer, and its respective parent, subsidiaries, Franchisees, agents, assigns, affiliates, employees, directors and officers as additional insureds. The policies shall also confirm that before any cancellation, modification, or reduction in coverage of such policies, the insurance company shall give thirty (30) calendar days advance written notice to Customer of such proposed cancellation, modification, or reduction, except for non-payment, in which case a ten (10) calendar day notification is required. Subject to the terms of this Agreement and excluding Customer contributory negligence or willful misconduct, Supplier waives for itself and its insurers all other rights of recovery against Customer for damages covered by such policies. Such policies shall include a clause expressly denying the insurer subrogation rights (except for Customer contributory negligence or willful misconduct) and providing that such policies are primary insurance and not excess over or contributory with any other valid, existing or applicable insurance carried by Customer, its parent, subsidiaries, affiliates, agents, assigns, employees, directors and officers, or Franchisees.  All such policies shall be provided by an insurer rated A+ or better by AM Best Company. Supplier shall be responsible for any subcontractors hired to help Supplier fulfill its obligations under this Agreement. Supplier shall ensure that each subcontractor has adequate insurance and Supplier shall be responsible for the acts and/or omissions of its subcontractors.

### 11.3    Amendments / Modification

This Agreement may not be altered or modified unless by a written amendment or a revised Schedule to this Agreement, executed by all Parties.

### 11.4    Assignments / Subcontractors

Neither Supplier nor Customer may assign or transfer this Agreement or any obligations, or any part thereof, or any interest therein, to a third party without the other Party's prior written consent. Said consent will not be unreasonably withheld. Either Party may however assign, at its sole

discretion, this Agreement in its entirety or in part, to any of its affiliates, parents, after-acquired companies or wholly-owned subsidiaries by giving the other Party a written notice.

Should Supplier need to subcontract any part of this Agreement, it shall obtain Customer's prior written consent. Such consent shall not relieve Supplier of any of its obligations or liabilities under this Agreement and Supplier shall, in all cases, be responsible for the acts and omissions of any such subcontractor, agents and employees as though they were the acts and omissions of Supplier.

### 11.5    Audit, Inspection and Access Rights

Customer, in its sole discretion will have the right, but not the obligation, to inspect, examine and audit the records, data, practices and procedures ("Data") of Supplier, including any of its affiliates, subcontractors, or third parties providing Products under this Agreement, solely as such Data relates to Supplier's business dealings with Customer and Supplier's compliance with this Agreement.  Customer's inspection right shall include the right to inspect Supplier's facility(ies) where the Products are developed, manufactured, and/or stored.

Supplier shall provide all necessary assistance in connection with such audits.  Nothing herein shall create or impose any obligation upon Customer with respect to Supplier's obligations under this Agreement or Applicable Laws. Customer's right to audit shall not be deemed as express or implied oversight or control of Supplier's business or Supplier's business practices.

### 11.6    Dispute Resolution

Without limitation of the rights of the Parties in the event of a Default under this Agreement or any material dispute arising between the Parties hereto, the Parties shall attempt to resolve any controversy or claim that may arise between the Parties relating to this Agreement first by informal good faith negotiations with the Parties' respective senior management. If no amicable resolution is reached within a reasonable time period, the Parties may seek all available legal and equitable remedies.

In the event that a suit is brought or any attorney is retained to enforce any term of this Agreement or to collect any money due or monetary damages or equitable relief for breach, the prevailing Party is entitled to recover, in addition to all other available remedies, reimbursement for such reasonable attorney' fees, court costs, costs of investigation and all other related expenses.

### 11.7    Survival

Specified Sections of this Agreement expressly survive expiration or termination of this Agreement.  In addition, payment of any amounts due and owing, including, without limitation, the payment of Rebates shall survive expiration or termination of this Agreement, to the extent any such amounts are due and owing as of the expiration or termination date, or thereafter resulting from obligations of either Party under the terms of this Agreement.

### 11.8    Governing Law

This Agreement shall be governed and construed in accordance with the laws of the State of Florida. All disputes arising under this Agreement shall be resolved by the state and federal courts located in the State of Florida, the venue and jurisdiction of which the parties hereto consent and shall not be permitted to object.

### 11.9   Severability

If any provision of this Agreement is declared or found to be illegal, unenforceable or void, then such provision shall be null and void, but other provisions will not be affected and shall be enforced to the full extent permitted by applicable law.

### 11.10   Waivers

No waiver of any provision in this Agreement will be binding unless in writing and signed by both Parties. The failure of a Party to insist on the strict enforcement of any provision of this Agreement shall not constitute a waiver of the provision and all terms of the Agreement will remain in full force and effect.

### 11.11   Counterparts

This Agreement may be executed in counterparts (each of which shall be deemed to be an original but all of which taken together shall constitute one and the same agreement) and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Party. Furthermore, this Agreement may be executed and delivered by electronic transmission.

### 11.12   Entirety and Integration

This Agreement, together with any schedules, exhibits, or attachments to this Agreement or any other document incorporated herein by reference, sets forth the entire agreement and understandings between the Parties hereto with respect to the subject matter hereof. This Agreement supersedes all previous verbal and/or written discussions and negotiations between the Parties and supersedes and replaces any other agreement(s) that may have existed between Customer and Supplier, which both Customer and Supplier mutually agree is(are) hereby terminated and rendered void and of no further force and effect. Further, this Agreement may be executed and delivered in electronic form, such as facsimile or scanned email.

### 11.13   Headings

The sections or paragraph headings in this Agreement are for convenience only, shall in no way define or limit the scope or content of this Agreement, and shall not be considered in any construction or interpretation of this Agreement or any part hereof.

### 11.14   Relationship of the Parties and Exclusivity

It is understood and agreed that each of the Parties is an independent entity and that neither Party is, nor shall be considered to be, an agent of the other. Neither Party shall act or represent itself, directly or by implication, as an agent of the other or in any manner assume or create any obligation on behalf of, or in the name of, the other.

Unless otherwise agreed to in writing, Supplier assumes full responsibility for the actions of all of its employees, subcontractors, or agents while performing the obligations under this Agreement.

This Agreement is non-exclusive, and either Party may enter into similar arrangements with other parties; *provided however*, during the one-year period beginning on December 1, 2021, Customer agrees that it will not purchase Products or similar Products from suppliers or manufacturers other than from Supplier.

**[SIGNATURE PAGE FOLLOWS]**

**THE PARTIES** hereto have signed this Agreement as of the date first above written.

**Customer**  **(Supplier)**

**Per:** *Scott Lockard*  **Per:** _____
**Name:** Scott Lockard  **Name:**
**Title:** Category Manager  **Title:**

**Per:** _____
**Name:**
**Title:**

## SCHEDULE A (PRODUCTS & PRICES)

*Notwithstanding anything to the contrary in this Agreement the Supplier will undertake to implement all technological changes implemented by the Customer in accordance with standards submitted by an industry association (EDI, GS1, etc.).*

*In the event that one or more wholesalers fails to establish or approve the pricing structure outlined below, Supplier agrees to rebate the Customer, on a quarterly basis, the difference between the wholesaler cost on the Products and the net pricing shown below.*

| Product | SKU | Price |
|---|---|---|
| HELO 1500 BLUEBERRY ICE | 810011142435 | 9.49 |
| HELO 1500 COOL MINT | 810011142411 | 9.49 |
| HELO 1500 MANGO | 810011142428 | 9.49 |
| HELO 1500 RED RAZZ | 810011142398 | 9.49 |
| HELO 1500 WATERMELON CHILL | 810011142442 | 9.49 |
| HELO 1500 STRAWBERRY BANANA | 810011142404 | 9.49 |
| HELO 2000 BLUEBERRY ICE | 810011142596 | 11.99 |
| HELO 2000 COOL MINT | 810011142633 | 11.99 |
| HELO 2000 MANGO | 810011142671 | 11.99 |
| HELO 2000 RED RAZZ | 810011142718 | 11.99 |
| HELO 2000 WATERMELON CHILL | 810011142510 | 11.99 |
| HELO 2000 STRAWBERRY BANANA | 810011142558 | 11.99 |
| HELO 3000 BLUEBERRY ICE | 810011142619 | 15.49 |
| HELO 3000 COOL MINT | 810011142657 | 15.49 |
| HELO 3000 MANGO | 810011142695 | 15.49 |
| HELO 3000 RED RAZZ | 810011142732 | 15.49 |
| HELO 3000 WATERMELON CHILL | 810011142534 | 15.49 |
| HELO 3000 STRAWBERRY BANANA | 810011142572 | 15.49 |

**SCHEDULE B (REBATES)**

[Intentionally Omitted]

# SCHEDULE C
## Consumable Products
## Supplier Responsibilities and Commitments

### a. General

In addition to any warranties or similar requirements set forth in the Agreement, Supplier shall abide by all laws related to the production, distribution and/or sale consumable goods, including but not limited to the Food Safety Modernization Act and shall maintain written documentation of such compliance.

Supplier agrees to maintain a comprehensive food safety and quality assurance program; examples include, but are not limited to: hazard assessments and control plans (e.g. HACCP or HACCP-like plans), sanitation standard operating procedures (SSOP), Good Manufacturing Practices (GMPs), periodic facility audits (utilizing internal or external resources), pest and allergen control programs, equipment calibration schedules, etc.

In addition to maintaining a food safety and quality assurance program, Supplier shall be certified to a food safety standard that is recognized by the Global Food Safety Initiative (GFSI) and, upon request by Customer, shall provide copies of the GFSI recognized audit results and/or GFSI certification. If Supplier is not GFSI certified as of the Effective Date, Supplier, by entering into this Agreement, agrees that it shall work cooperatively with Customer towards achieving such certification within a reasonable timeframe.

Supplier agrees that all packaging and labeling shall be accurate, complete, and comply with all federal regulations. Except where specifically exempt, all food supplied to Customer shall have an ingredient statement on the label or be accompanied by an ingredient statement in the form of a sign, placard, flipchart, sticker, or other acceptable form of labeling. Ingredient statements must include major food allergens present or potentially present in the product. Upon request, Supplier agrees to provide documentation demonstrating the accuracy of labeling of products provided to, distributed to, and/or ordered by Customer. Where applicable, labels for products subject to Perishable Agricultural Commodities Act must include the country or countries of origin of the product and/or ingredients.

### b. Minimum Shelf Life Requirements

Supplier is required to provide Customer with fresh, in-date products. The minimum shelf life remaining to the distributor should be [x days or 2/3rds of the total shelf life]. Customer expects Supplier to work collaboratively with them to meet these requirements.

### c. Quality and Food Safety

Supplier shall ensure that its employees, agents and subcontractors in each manufacturing facility comply with all applicable Federal, State, County, City, and other regulatory laws and building codes.

Supplier is further required to monitor and maintain compliance with changing laws and regulations. This includes, but is not limited to, the Food Safety and Modernization Act. Supplier acknowledges that while this legislation has been signed into law, it is subject to frequent changes and Supplier is responsible for awareness of and compliance with new rules, regulations, and industry best practices, as applicable.